Pat ROGER, Plaintiff,

v.

**YELLOW FREIGHT SYSTEMS, INC., Defendant.**

No. 92–1304.

United States District Court, C.D. Illinois, Peoria Division.

June 30, 1993.

Jerry Serritella, Peoria, IL, for plaintiff.

Jeffrey Lee Madoff, Steven L. Brenneman, Matkov Salzman Madoff & Gunn, Chicago, IL, for defendant.

### ORDER

McDADE, District Judge.

Before the Court is Defendant's Motion for Summary Judgment on Plaintiff's Amended Complaint. Plaintiff's Amended Complaint is in one count alleging that he was discharged "in retaliation for the Plaintiff filing a workmens' compensation claim against the Defendant." (Amended Complaint para. 9). The Court has jurisdiction of this diversity case pursuant to 28 U.S.C. § 1332.

"A motion for summary judgment is not an appropriate occasion for weighing the evidence; rather, the inquiry is limited to determining if there is a genuine issue for trial." *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.ED.2d 202 (1986). This Court must "view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." *Holland v. Jefferson National Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). When faced with a Motion for Summary Judgment, the non-moving party may not rest on its pleadings. Rather, it is necessary for the non-moving party to demonstrate, through specific evidence, that there remains a genuine issue of triable fact. *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

### BACKGROUND

Defendant is a trucking company engaged in the business of freight transportation services. In 1986, Plaintiff resigned his position as a road driver for Defendant to accept the position of Safety Training Specialist. (Thompson Affidavit p. 1). The duties of the Safety Training Specialist involved touring the United States with Yellow Freight's Safety Training Unit to present a variety of safety programs to various audiences. *Id.* The Safety Training Unit was a tractor-trailer outfitted with VCRs, a monitor, safety video tapes, displays, and its own generator. (*Id.* p. 2).

On October 31, 1990, Plaintiff fell off the tractor-trailer and injured his back. (Plaintiff's Dep. p. 32–34). Plaintiff continued to work until June 6, 1991, but eventually stopped working because of pain. On January 23, 1992, Plaintiff was laid off. (Thompson Affidavit Ex. C). His status was changed to "termination due to lack of work" on April 9, 1992. (Thompson Affidavit, Ex. D).

Kenneth Thompson was employed by Defendant as Vice President–Linehaul Safety throughout 1991. In the fall of 1991, Thompson was instructed by Robert Bostick, his

supervisor and Defendant's Senior Vice President–Operations, to review the Safety Department and make recommendations to Bostick regarding expense reduction. (Thompson Affidavit p. 3, Bostick Affidavit p. 3).

In November of 1991, Thompson recommended the elimination of four Safety Coordinators, and those positions were eliminated. Thompson subsequently recommended that Plaintiff's position as Safety Training Specialist be eliminated. The stated reason for eliminating Plaintiff's position is as follows:

The reasons that we selected the Safety Training Specialist job to be eliminated as part of the downsizing and restructuring of my department included the high costs of operating and maintaining the Safety Training Unit, the fact that the Safety Training Unit did not directly contribute to revenue for Yellow Freight, the fact that the Safety Training Unit and the Safety Training Specialist job were largely non-essential public relations efforts on behalf of Yellow Freight, and Yellow Freight's desire not to alienate its customers by operation of the rather extravagant Safety Training Unit when, at the same time, it was implementing rate increases for its customers' shipment of freight.

(Thompson Affidavit p. 4–5).

After the Safety Training Specialist position was eliminated, the duties that had been performed by Plaintiff were no longer performed by anyone in Defendant's employ. The Safety Training Unit was put up for sale and eventually purchased by the Pennsylvania Trucking Association in 1992. *Id.* at 6. Subsequent to his discharge, Plaintiff filed workers' compensation claims in both Illinois and Kansas. These claims were filed at approximately the same time in "May or June" of 1992. (Rogers Dep. p. 137–38).

## ANALYSIS

"Illinois courts have recognized a cause of action when a Plaintiff is discharged in retaliation for filing a workers' compensation claim." *Washburn v. IBP, Inc.,* 910 F.2d 372, 373 (7th Cir.1990) (citations omitted). For Plaintiff to recover for the tort of retaliatory discharge, he must prove that "(1) he

was discharged from employment; (2) in retaliation for his activities; and (3) the discharge violates a clear public policy." *Id.* When applied specifically to workers' compensation claims, Plaintiff must prove the following elements:

First the plaintiff must have been an employee of the defendant before the injury occurred. Second, the plaintiff must have exercised or threatened to exercise a right granted by the workers' compensation act. Finally, the plaintiff's termination must have been causally related to his or her filing of a claim or statement of intent under the act.

*Mercil v. Federal Express Corp.,* 664 F.Supp. 315, 317 (N.D.Ill.1987) (citations omitted). "The causation element is not met if the employer has a valid basis, which is not a pretext, for discharging the plaintiff." *Id.* (citations omitted). However, if the plaintiff is an at-will employee who may be fired for no reason at all, "the employer need not tender a legitimate reason for the termination if the employee has not proved, or at least presented a *prima facie* case, that he or she was fired in retaliation for asserting workers' compensation act rights." *Id.*

In its Motion for Summary Judgment, Defendant argues that Plaintiff cannot establish that he was discharged in retaliation for filing a workers' compensation claim because he did not file the claim until after his discharge.

The essential allegations in Plaintiff's Amended Complaint are set out in paragraphs nine and ten which state:

9. That the discharge of the Plaintiff was in retaliation for the Plaintiff filing a workmens' compensation claim against the Defendant.

10. That under Section 4 of the Workmens' Compensation Act of the State of Illinois, it is illegal for an employer to discharge an employee for exercising his rights under the Act by filing a claim seeking relief under the Act and said Section 4 establishes a clear mandated public policy of the State of Illinois.

(Amended Complaint para. 9–10).

Thus, the only theory of recovery advanced by Plaintiff is that he was fired in retaliation

for filing a workers' compensation claim. Defendant argues, however, that Plaintiff cannot establish that his discharge was retaliatory because his workers' compensation claim was filed after his discharge.

The evidence indicates that Plaintiff was laid off in January of 1992, and that his status was changed to "terminated" on April 9, 1992. By Plaintiff's own admission, however, he did not file a workers' compensation claim until May or June of 1992, one to two months after he was officially terminated. Plaintiff's deposition testimony casts further light on the circumstances surrounding the filing of his claim:

Q. When was the first time you contemplated filing these workers' comp claims?

A. When I stopped hearing anything from Yellow Freight.

Q. When was that?

A. I'm guessing now. In May or June when I filed *for adjudication of my work-ers' comp case.*

Q. So shortly before you actually filed is when you first contemplated doing so?

A. Yeah.

Q. Have you ever had any conversations with any representative of Yellow Freight regarding your workers' compensation claims?

A. No.

Q. Did you ever inform anyone from Yellow Freight that you intended to file a workers' compensation claim?

A. No.

Q. Do you remember talking with either Mr. Thompson or Mr. Cook about your workers' compensation claim?

A. No.

Q. How about Mr. Bostick?

A. No.

(Plaintiff's Dep. p. 139–40).

■ Plaintiff's own testimony shows that he could not have been discharged in retaliation for filing a workers' compensation claim because he filed the claims weeks after his discharge. In response Plaintiff argues that:

[T]he "gravamen of the tort of retaliatory discharge is not that the Plaintiff was terminated necessarily *after* he filed a work-

mens' compensation claim. The correct terminology is that a Plaintiff is terminated *after* he exercises his rights pursuant to the Workmens' Compensation Act. It is true that the Amended Complaint is stated along the terms of the Plaintiff filing a workmens' compensation claim. However, the pleadings in Federal Court are notice pleadings and it is only required that they give the other side sufficient notice of what he is being charged with.

(Plaintiff's response p. 1).

Plaintiff's argument creates a distinction without a difference. As noted above in Plaintiff's deposition, he neither discussed workers' compensation with his superiors nor contemplated filing a claim until after he was discharged. Thus, even accepting Plaintiff's "correct terminology" that he was terminated *after* he "exercised his rights" under the Workers' Compensation Act, he still has not established as a matter of law that he suffered retaliatory discharge. As noted, Plaintiff did not contemplate nor take any steps toward making his claim for Workers' Compensation until one to two months after he was discharged and five to six months after he was laid off. In a similar situation, the court in *Springer v. Allis–Chalmers Corp.,* 1988 WL 19243 (C.D.Ill.1987), stated as follows:

Springer was informed of his termination before there was any discussion by Springer about applying for disability benefits. Therefore, in the absence of evidence that Springer had previously discussed this anticipated action, and that Allis–Chalmers knew of Springer's plan, there is no scenario that this Court can imagine under which Allis–Chalmers could be deemed to have terminated Springer in retaliation for applying for disability benefits. Further, the record reflects that at the time Springer was terminated, he had not taken any steps toward making [an] application for disability benefits.

*Id.* at 3. In *Springer,* the court granted Defendant's motion for summary judgment on the retaliatory discharge claim. *See also Mercil,* 664 F.Supp. 315 (The court granted summary judgment where none of the em-

ployees charged with the responsibility of terminating the employee were informed that he was planing to file a workers' compensation plan).[1]

■ In an attempt to salvage his cause of action, Plaintiff has accused Defendant's representatives of a great deal of misconduct which occurred prior to his discharge. Plaintiff has also accused Defendant of "intentionally mislead[ing] the Court as to a proper analyazation (sic) of the facts of this case." (Plaintiff's Answer to Defendant's Motion for Summary Judgment p. 1). A careful review of the evidence, however, reveals that it is Plaintiff who has attempted to mislead the Court. For example, Plaintiff argues that the following occurred subsequent to his injury but before his discharge:

> Thompson accused Plaintiff of trying to pull something on the company.
> Thompson accused Plaintiff of trying to pull something on Thompson.
> Thompson threatened Plaintiff when Plaintiff told Thompson that Juanita Ball (the person who handles insurance claims for Defendant) was mistreating the Plaintiff.
> Thompson's attitude changed towards the Plaintiff after Plaintiff reported the injury and Plaintiff then became a bad guy.
> Thompson stated that Plaintiff was trying to pull something on Juanita Ball.

(Plaintiff's brief p. 4).

Each of the alleged incidents reference page 144 of Plaintiff's deposition, but a review of the page reveals Defendant's representatives did not make the statements or accusations attributed to them by Plaintiff. Rather, the incidents reflect Plaintiff's own perception of events. Plaintiff stated:

> Right from the very beginning of this thing from the time I told Mr. Thompson that I was injured on the job up until my termination, I could see the difference, the change of his attitude right from the get-go all the way along the line with Juanita

Ball. Whenever I would have a conversation with Juanita Ball and I would call him and complain, I was the bad guy, "Don't antagonize Juanita Ball." I was always the bad guy with Juanita Ball. With Mr. Thompson I was the bad guy, like I was trying to pull something on Yellow Freight, like I was trying to pull something on Ken Thompson, like I was trying to pull something on Juanita Ball.

(Plaintiff's Dep. p. 145).

Plaintiff also refers to page 76 of his deposition to support an argument that on June 12, 1991 "Juanita Ball accused the Plaintiff of trying to pull something on the company...." (Plaintiff's brief p. 5). However, a review of page 76 reveals that this was not a statement by Juanita Ball, but Plaintiff's perception of events. The deposition reads:

> Q. What, if anything, do you recall about these conversations with Juanita Ball that happened after the June 12th appointment?
> A. The very same thing that happened on all of them, very antagonistic attitude towards me like I was trying to pull something on the company continually all the time and Juanita Ball is wonderful.

Clearly, Defendant's representatives did not make the statements that Plaintiff specifically accuses them of making. Rather Plaintiff refers to his own thoughts as direct statements made by Defendant's representatives. Such mischaracterization of the evidence is an inappropriate manner in which to rebut a Motion for Summary Judgment.[2]

■ Regardless of the above, there is also ample evidence in the record that Plaintiff was terminated due to a company-wide reduction in force (RIF). The evidence indicates that 1991 was a difficult year for Defendant due to the weak economy. "The holding company's net income dropped to 95 cents per share in 1991, compared to 1990 when net income was $2.31 per share. Fur-

---

1. In *Mercil,* the court also granted summary judgment on a second retaliatory discharge count where the plaintiff specifically pleaded that he was terminated in retaliation for a contemplated workers' compensation claim, yet argued a contrary theory in response to the motion for summary judgment.

2. Plaintiff also argues that Defendant accused Plaintiff "of feigning an injury and/or malingering...." (Plaintiff's brief p. 7) but offers no evidence to support this argument.

ther, the holding company's ratio of operating expenses to revenue was 97.6 in 1991, up from 1990's ratio of 94.8." (Bostick Affidavit p. 2). The holding company, through its main subsidiary, Yellow Freight, took measures to reduce costs and increase profits. Accordingly, Bostick instructed department heads to recommend cost cutting measures. *Id.* Six departments ranging in size from 2 to 40 employees were involved, and overall, Defendant reduced its work force by over 1,400 employees between 1991 and 1992. (Defendant's Interrogatory response # 2). Mr. Thompson, who was Plaintiff's department head, recommended the elimination of 5 people, which included four Safety Coordinators and Plaintiff's position, the Safety Training Specialist. Moreover, sixty-six employees who reported to or worked out of Defendant's general office, including Plaintiff, were laid off. *Id.* at 3, (Defendant's Interrogatory response # 5). As previously noted, Plaintiff's job was eliminated because it was a nonessential position with high operating costs which did not directly contribute to revenue. *Id.* Furthermore, the evidence reveals that the total operating expenses for the Safety Training Unit from 1990 through June 6, 1991, the date Plaintiff stopped working were $154,525.31. (Thompson Affidavit p. 2). After Plaintiff's position was eliminated, the Safety Training Unit was sold and no one has since performed Plaintiff's old duties. (Thompson Affidavit para. 16, Roger Dep. p. 134–37).

Plaintiff claims, without support, that he was not terminated as part of a RIF by arguing that a downsizing of 1,400 employees does not qualify as a RIF, that Defendant manipulated the numbers to show a RIF, and that Defendant did not have a written plan for a RIF. Plaintiff's argument, in addition to being unsupported, is also unpersuasive. *See Konowitz v. Schnadig Corp.,* 965 F.2d 230 (7th Cir.1992) (The absence of written guidelines for carrying out RIFs is irrelevant.)

Based upon the evidence, the Court finds that Plaintiff was discharged due to an overall reduction in force. Accordingly, Plaintiff cannot establish that his discharge was causally connected to filing a Workers Compensa-

tion claim. Therefore, the discharge was not retaliatory. *See Groark v. Thorleif Larsen & Son, Inc.,* 231 Ill.App.3d 39, 61, 172 Ill.Dec. 799, 596 N.E.2d 78 (1992) (Overall reduction in work force prevented employee from satisfying causal relationship for retaliatory discharge claim based on failure to rehire worker after filing workers' compensation claim); *Lewis v. Zachary Confections Co.,* 153 Ill. App.3d 311, 106 Ill.Dec. 296, 505 N.E.2d 1087, *app. denied* 116 Ill.2d 560, 113 Ill.Dec. 301, 515 N.E.2d 110 (1987) (A laid off seasonal employee could not causally connect lay off with filing of workers' compensation claim); *Armstrong v. Freeman United Coal Mining Co.,* 112 Ill.App.3d 1020, 68 Ill.Dec. 562, 446 N.E.2d 296 (1983) (Employee was not terminated in retaliation for exercise of rights under Workers' Compensation Act where termination was part of a general cut-back in employment).

## CONCLUSION

In Summary, the Court finds that Defendant has shown that the Plaintiff was not discharged in retaliation for filing a workers' compensation claim. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment, and the Clerk of the Court is Directed to enter judgment in favor of Defendant and against Plaintiff. Each party to bear their own costs. **CASE TERMINATED.**